### CROSSINGS OF INTERURBAN AND STEAM RAILWAYS.

[Common Pleas Court of Darke County.]

THE DAYTON & UNION RAILROAD CO. v. THE DAYTON & MUNCIE TRACTION CO.

Decided, August 20, 1903.

*Railway Crossing Statute Construed—Classification of Interurban Railways.*

The act of May 10, 1902 (95 O. L., 530), authorizing the court of common pleas, or a judge thereof in vacation, to fix the mode of crossing, where it becomes necessary for the tracks of one railroad company to cross the tracks of another railroad company, does not apply to interurban railway companies, organized under the street railway act.

ALLREAD, J.

On August 15th, 1903, The Dayton & Union Railroad Company made an application in this court to fix and determine the mode and manner of the crossing to be made over its tracks near the Parent school house in this county, by the Dayton & Muncie Traction Company.

On August 17th a supplemental petition was filed asking for a restraining order staying further proceedings in the probate court in an action pending in that court for the condemnation of the crossing at grade.

This relief is contended for under the Act of May 10th, 1902 (95 O. L., 530). The title is "An act to provide for one steam

railroad crossing another steam railroad." It provides "That where it becomes necessary for the track of one railroad company to cross the track of another railroad company, unless the manner of making such crossing shall be agreed to between such companies, it shall be the duty of the court of common pleas of the county wherein such crossing is located, or a judge thereof in vacation, on application of either party, to ascertain and define by its decree the mode of such crossing which will inflict the least practical injury upon the rights of the company owning the road which is intended to be crossed; and if in the opinion of such court, or judge thereof, it is reasonable and practicable to avoid a grade crossing, it shall by its process prevent a crossing at grade."

The railroad company contends that this act is applicable to interurban railroads, and bases its construction largely upon the legislative history of the enactment. As the bill was introduced in the House the title as well as the enacting part provided for the crossing of one "railroad" by another "railroad." The word "steam" did not appear. In the Senate the bill was amended in the enacting part so as to add the word "steam" before "railroad," and in that form passed by the Senate. After its passage and while the bill still remained in the Senate the title was amended by the addition of the word "steam" before "railroad". It was then messaged to the House. The House refused to concur in the amendment of the Senate adding the word "steam" before railroad in the enacting part, and this led to a conference committee. Finally, the House insisting upon its opposition to the Senate amendment, the Senate receded and the bill was adopted in both branches of the General Assembly with the word "steam" stricken out of the enacting part. But for some reason the word "steam" was not stricken from the title. The bill was enrolled and signed by the presiding officers of the House and Senate in the form in which it appears in the Session Laws.

There has been in recent years much conflict of opinion as to what the term "railroad" includes, and especially as to how interurban railroads are to be classified. The term railroad in its broadest, and in its true etymological sense, applies to all sorts of transportation upon fixed tracks, but in its legislative sense or the sense in which it is used in the statutes, it is, at least

ordinarily, much more confined.    Steam railroads antedate all other character of railroads, and the early legislation refers to them as "railroads," there being at that time no occasion for any other designation.    The next in point of time were street railways.    The Legislature in dealing with street railroads referred to them by that designation, and we find during the period of the existence of ordinary railways and street railways that legislation directed to railways, or, as we know them, steam railways, designated them by the title of "railroads," whereas legislation applicable to street railways designated them as "street railways." The next character of railways in point of time was suburban railways.    One of the earliest, possibly, of the suburban railways was the White Line at Dayton, which extends from the city of Dayton to the Dayton Soldiers' Home.    These roads were provided for by an extension of the street railway act, as provided in Sections 2505 and 3438, whereby a street railway could extend its lines over the public highway outside of the municipality. Interurban railways, a still later system, were at first constructed as street railways under the suburban railway act.    Later on— I think probably the first enactment was in 1894—they were provided for as street railways, or in the exact language "as companies organized under Section 3236 of the Revised Statutes, to construct, maintain and operate electric street railroads or street railroads using other than animal power."    Whether that is a proper classification of interurban railways is not for the court to say.    It is sufficient that the Legislature has so designated them.

The question of classification of interurban railways was presented to the circuit court in the Millcreek Valley case, decided in 21 Circuit Court, page 391, and it was there held that Section 247f of the Revised Statutes, which by its terms applies to railroads and electric railroads, does not apply to interurban railways, they being considered street railroads within the classification adopted by the General Assembly.

The Supreme Court of the state in the case of *The Massillon Bridge Co.* v. *The Cambridge Iron Co.*, in the 59 Ohio State, 186, held that the general railroad statutes as to a mechanic's lien did not apply to interurban railroads.    And the court, on page 188 of that report, Judge Burket delivering the opinion, says:

"From a careful examination of the course of legislation on the subject of railroads and street railroads, it appears that the legislation as to each has been carefully kept separate, and the statute as to railroads do not apply to street railroads unless made to do so by clear reference. * * * Sections 2501 and 2505*d*, inclusive, are all prior to Section 3437 and all affect street railroads, but they do not relate to railroads, thus showing that the General Assembly do not regard even interurban street railroads as being included in the word 'railroad.'" *Greene v. St. Ry. Co.,* 62 O. S., 67; *C., L. & A. E. St. R. R. v. Lohe,* 68 O. S.—; p. 139, Ohio Law Reporter.

As to crossings, it appears that Section 247*f* and 247*g*, which provide for the interlocking system, and Section 3333, which provides for the crossing of one railroad over another railroad, do not apply to interurban roads. Prior to the session of the General Assembly in 1902 the regulation of the crossing of steam roads by interurban roads was not very definitely provided for. Section 3443-5-6 seems to cover the subject of street railroads crossing each other and crossing steam roads, but in the Session Laws of 1902, on page 356, four days before the act in question, an act was passed to abolish grade crossings in municipal corporations. The first seven sections of this act relate to "railroads" by that designation. The eighth section relates to "street railroads," thereby showing that the General Assembly at that time, at least, and in that act intended to provide for railroads generally and also for street railroads under a special designation. The claim, however, is made by the Dayton & Union Railroad Company that the history of the passage of this act, House Bill 230, raises a different inference from that which would ordinarily apply in the case of a general statute where the word "railroad" was used and without any other aid to indicate the intention of the General Assembly.

The rules of interpretation of statutes are well known. Those applicable to this case may be classified as follows: First. The settled rule of construction by the courts and by popular signification. Second. By reference to statutes *in pari materia.* Third. By reference to the title of the act. Fourth. By the history of the passage of the act.

I do not give these in the order of their relative importance but in the order of their discussion. I have referred to the settled

rule of construction. Our courts have decided that the Legislature is presumed to have in mind at the time of the passage of an act what the courts have decided as to the meaning of terms employed. The Legislature is also presumed to so act as to make the whole body of the laws a harmonious one; and therefore the acts *in pari materia* may be considered as an aid to construction. The title of the act, also, may be looked to in determining what the act itself means. A title, under our Constitution and under the laws of this state, is sanctioned by both Houses in the passage of the act. While, of course, the title does not constitute any part of the act proper—the act itself is the enacting part—still in case of doubt the title may be looked to as one of the expressions of the General Assembly as to the thing about which they were legislating.

The title in this case is expressly limited to steam railroads, but it is said that the legislative history of the bill shows that the title in that respect was a mistake. There is some inference, no doubt, arising from the history of this bill that the word "steam" was left in the title by mistake. But, as stated in the case in the 52d Ohio State, first case in that report, the case involving the Insolvency Court of Cincinnati, that unless a mistake is corrected by the act itself, or by other statutes *in pari materia,* it is better to endure temporary inconvenience than it is for the court by judicial construction to correct a supposed mistake in the statute.

Now, as to the history of this bill in its passage through the House and in the amendment which the Senate insisted upon and which the House refused, the court has been in considerable doubt as to whether the inference so arising will override the other rules of construction. I am inclined to the opinion that it will not. The courts in the case of a constitutional provision as well as an act of Congress will refer to the debates for the purpose of determining what the meaning of the enactment is where there is doubt, but the expression of opinion of the individual members of Congress or of the individual members of the constitutional convention is not conclusive. It is simply one of the aids which the court will adopt in determining what the meaning of an ambiguous enactment is. The court is, therefore, of the

opinion that the act of the General Assembly of May 10th, 1902, found at page 530, does not, *ex vi termini* include traction or interurban railroads.

Now, it is claimed that by the enactment also of May 10th, 1902, on page 539 of the same volume, the law of steam railroads is applicable. Section 3443-10 provides "that all companies organized for the construction and operation of interurban railroads, using any motive power other than animal power, shall, when necessary to enter upon or use private property in such construction and operation outside of municipalities, have the same power and right of eminent domain as is now possessed by steam railroad companies." This should be read as part of the original act with the amendment engrafted upon it.

The original act in Section 6, which is now 3443-13, provides that such companies shall be subject to the same regulations now provided for street railroads, in so far as the same are applicable. So that it would appear from the entire act, together with the amendment, that as to the right of eminent domain interurban railroad companies have the same power as is now possessed by steam railroad companies, whereas in the matter of regulations the law of street railroad companies so far as applicable, control. The question, therefore, is whether this power of the court of common pleas or a judge under the act of May 10th, 1902, is an incident of the right of eminent domain, so that the amendment of 1902 to Section 3443-10 applies.

A case in point in the 30th Ohio State is found on page 604. That is a case with which counsel are undoubtedly familiar, although the court was not until the examination of it here. There the Lake Shore & Michigan Railroad Company condemned· a strip of ground across the Cincinnati, Sandusky & Cleveland Railroad Company 100 feet one way and 66 feet the other, and the proceedings went to judgment in the probate court and was reversed and tried a second time and came back, and one of the questions before the Supreme Court was whether the crossing of the road—the crossing of the tracks—was to be considered as an element of damages in the condemnation proceedings. Now, on the question, so far as it is applicable here, whether the regulation as to the manner and mode of crossing a track is a part of the

power of eminent domain or whether it is a mere police regulation, quoting only from the syllabus in this case it is said: "Among the powers thus reserved (that is, reserved by the state), and which must inhere in the state, is that of prescribing reasonable regulations for the government of railroad corporations in regard to the manner in which they shall exercise their corporate franchises in running their trains, so as to avoid danger to the lives and property of its citizens.   Such corporations accept their charter and franchises, and own and use their tracks, subject also to the power of the state to authorize the construction of other railroads across their tracks whenever the public welfare may require.   Neither the priority of one charter over the other, nor the prior location or construction of a railroad thereunder, affects this right.   Under the Constitution and laws of this state the right of one railroad corporation to cross the track of another in constructing and operating its road, is derived by grant of the franchise so to do from the state, and not by purchase or appropriation from the road first located and constructed.   The latter has no vested exclusive right to such crossing for its use, against the right of the public to the crossing."  Judge Johnson discusses that proposition at considerable length in the opinion and the same question is also discussed in the Pennsylvania cases to which counsel referred the court, where it is held that the right to cross the tracks is a part of the police power of the state and is not a part of the right of eminent domain.

I have, therefore, come to the conclusion that this act of May 10th, 1902, found on page 539, does not by reference make the previous act, or the act at least found on the previous page, applicable to street railroad or interurban railroad companies.

The application of the Dayton & Union Railroad Company is therefore dismissed.

*R. M. Nevin* and *John C. Clark,* for plaintiff.

*Anderson & Bowman* and *E. P. Matthews,* for defendant.